No. 25-3343

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

HOUSTON CLYDE,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 3:22-cr-50034
The Honorable Judge Iain D. Johnston

# BRIEF AND REQUIRED SHORT APPENDIX OF DEFENDANT-APPELLANT, HOUSTON CLYDE

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
401 Main Street, Suite 1500
Peoria, Illinois 61602
Telephone: (309) 671-7891
Fax: (309) 671-7898
Email: Thomas_Patton@fd.org

THOMAS W. PATTON
Federal Public Defender

Attorney for Defendant-Appellant,
Houston Clyde

**ORAL ARGUMENT REQUESTED**

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-3343

Short Caption: United States v. Clyde

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IS ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Houston Clyde

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Richard H. McLeese; Federal Public Defender's Office for the Central District of Illinois (Thomas W. Patton)

(3) If the party, amicus or intervener is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervener's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Thomas W. Patton Date: 5/7/2026

Attorney's Printed Name: Thomas W. Patton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☒ **No** ☐

Address: 401 Main Street, Suite 1500
Peoria, Illinois 61602

Phone Number: (309) 671-7891 Fax Number: (309) 671-7898

E-Mail Address: Thomas_Patton@fd.org

**TABLE OF CONTENTS**

**PAGE**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT .................... ii

TABLE OF AUTHORITIES .................... iv

JURISDICTIONAL STATEMENT .................... 1

ISSUES PRESENTED FOR REVIEW .................... 2

STATEMENT OF THE CASE .................... 3

A. Mr. Clyde's childhood .................... 3

B. Mr. Clyde's mental health diagnosis and prior conviction .................... 6

C. USP Thomson and Mr. Clyde's killing of another inmate .................... 8

D. Mr. Clyde's prosecution .................... 11

1. The guideline calculations and party's sentencing arguments .................... 11

2. Mr. Clyde's sentencing .................... 13

SUMMARY OF ARGUMENT .................... 19

ARGUMENT .................... 21

A. Standard of Review and Legal Standard .................... 21

B. The district court committed procedural error by failing to adequately explain its dramatic variance from the applicable guideline range to a sentence of life imprisonment. .................... 22

C. The district court's extreme variance to a sentence of life imprisonment was substantively unreasonable. .................... 28

CONCLUSION .................... 31

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B) .................... 32

## TABLE OF AUTHORITIES

**PAGE**

### Cases

*Gall v. United States*, 552 U.S. 38 (2007) .......... 21, 29

*Rita v. United States*, 551 U.S. 338 (2007) .......... 28

*United States v. Badoni*, No. 12-cr-08262 (D. Arizona) .......... 10

*United States v. Ballard*, 950 F.3d 434 (7th Cir. 2020) .......... 21

*United States v. Campbell*, 37 F.4th 1345 (7th Cir. 2022) .......... 21

*United States v. Castillo*, 695 F.3d 672 (7th Cir. 2012) .......... 21

*United States v. Friedman*, 554 F.3d 1301 (10th Cir. 2009) .......... 22

*United States v. Guevara-Lopez*, 147 F.4th 1174 (10th Cir. 2025) .......... 22, 29

*United States v. Lee*, 974 F.3d 670 (6th Cir. 2020) .......... 22, 30

*United States v. Miller*, 601 F.3d 734 (7th Cir. 2010) .......... 21

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) .......... 22

*United States v. Rosen*, 726 F.3d 1017 (7th Cir. 2013) .......... 22

*United States v. Simonson*, No. 25-2530 (7th Cir.) .......... 10

### Statutes

18 U.S.C. § 1111 .......... 1, 11

18 U.S.C. § 113 .......... 1

18 U.S.C. § 1791 .......... 1

18 U.S.C. § 3231 .......... 1

18 U.S.C. § 3553 .......... passim

18 U.S.C. § 3742 .......... 1

28 U.S.C. § 1291 .......... 1

**Other Authorities**

Fed.R.App.P. 4 .......... 1
https://jsin.ussc.gov/analytics/saw.dll?Dashboard .......... 23, 29
https://oig.justice.gov/reports/review-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness .......... 9
https://www.mayoclinic.org/diseases-conditions/intermittent-explosive-disorder/symptoms-causes/syc-20373921 .......... 8, 27
https://www.npr.org/2023/02/14/1157035089/deadliest-federal-prison-thompson-correctional-center-closing .......... 10
https://www.ssa.gov/oact/STATS/table4c6.html .......... 23
https://www.themarshallproject.org/2022/05/31/how-the-newest-federal-prison-became-one-of-the-deadliest .......... 10
https://www.ussc.gov/about/annual-report-2023 .......... 24
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Life.pdf .......... 23, 30
https://www.washlaw.org/wp-content/uploads/2023/07/Cruel-and-Usual-An-Investigation-Into-Prison-Abuse-at-USP-Thomson.pdf .......... 8, 9
U.S.S.G. § 2A1.1 .......... 23, 24
U.S.S.G. § 2A1.2 .......... 24
U.S.S.G. § 3E1.1 .......... 30

## JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of Illinois had jurisdiction under 18 U.S.C. § 3231. Mr. Clyde was charged by indictment with murder in violation of 18 U.S.C. § 1111(a), assault causing serious bodily injury in violation of 18 U.S.C. § 113(a)(6) and being a prisoner in possession of a prohibited object in violation of 18 U.S.C. § 1791(a)(2). R.3.[1]

This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court imposed sentence on December 17, 2025, and entered a final judgment in a criminal case the next day, December 18, 2025. R.71. Mr. Clyde filed a timely notice of appeal on December 30, 2025. R.73; see Fed.R.App.P. 4(b).

[1] The following abbreviations are used herein: Record on appeal: "R. at #__;" Appendix: "App. at __;" Presentence Investigation Report: "PSR. at ¶ __;" Supplemental Presentence Investigation Report: "Supp PSR at __;" and Records for appellate cases: "Ct. App. R. [number] at # __."

## ISSUES PRESENTED FOR REVIEW

Was the district court's upward variance from a guideline range of 262 to 327 months' imprisonment to life imprisonment procedurally and substantively reasonable?

## STATEMENT OF THE CASE

"Mr. Clyde, no child should go through what you went through as a youth and be subjected to what you were subjected to." App.1. That statement by the district court at Mr. Clyde's sentencing was an understatement. Mr. Clyde is a member of the Navajo Nation and grew up on a Navajo reservation in Arizona. PSR §§ 56, 58, 76. His entire life has been dominated by severe violence, addiction, and dysfunction.

### A. Mr. Clyde's childhood

Mr. Clyde's mother suffered from extreme alcohol addiction, turning custody of Mr. Clyde and his half-siblings over to his maternal great aunt (who Mr. Clyde refers to as his grandmother) when Mr. Clyde was 6 years old. PSR §§ 57, 62. Before that happened Mr. Clyde witnessed his mother "run around and drink," seeing her only about three times a month. PSR § 59. He also saw one of his mother's boyfriends sexually abuse his sister, another break his mother's arm, and yet another break his mother's leg. PSR § 62.

Mr. Clyde's mother beat him with sticks and hangers and punched him with her closed fist. She's been convicted of aggravated driving under the influence, aggravated assault, assault, and driving under the influence with extreme blood alcohol content. PSR § 69. His maternal great aunt also beat him with belts up to the age of 11. PSR § 62. A BOP forensic evaluation of Mr. Clyde

noted: "There was an indication of a history of substance abuse, drug trafficking, and prostitution for their mother in their former home as well as exposure to domestic violence . . . . there was also a history of exposure to sexualized behavior, sexual abuse, and severe neglect." PSR § 63.

Mr. Clyde only met his father on two occasions when he was 14 and 18. PSR § 67. His father has been convicted of aggravated assault and convicted three times for aggravated driving under the influence. PSR § 68.

As a juvenile, Mr. Clyde was placed in the Arizona Department of Juvenile Corrections. While there he received the following diagnosis: "Prior records indicate in 2003 the defendant (age 6) was diagnosed with ADHD and was medicated. Group home records from 2009 through 2011 list a diagnosis of ADHD, Combined Type; Conduct Disorder; and Oppositional Defiant Disorder. He was prescribed Adderall, 20 mg daily. On January 9, 2004, he was diagnosed with Conduct Disorder/Childhood Onset Type, Mild and 'Educational problems.' On March 2, 2004, his diagnosis included Posttraumatic Stress Disorder and 'Education problems.' The defendant has been medicated since he was 6. He has also been diagnosed with Emotional Disability, Psychosis Disorder, Alcohol and Cannabis Abuse, Continuous." PSR § 88.

Medical records from the Tuba City Arizona Medical Center showed the following:

- on November 4, 2008, the defendant (age 11) was treated after he was assaulted by two classmates, during which he was reportedly strangled, thrown to the ground, and "kneed" in the ribs.

- on November 22, 2011, the defendant (age 14) was treated for facial trauma after he was punched in the face by three "older men."

- on December 27, 2012, the defendant (age 15) was treated for a head contusion after he was reportedly struck in the head with a bat and lost consciousness.

- on November 12, 2013, the defendant (age 16) was treated for a hand contusion after being involved in a fight.

- on February 26, 2014, the defendant (age 16) was treated for alcohol intoxication, combative behavior, and facial contusions.

- on April 30, 2015, the defendant (age 18) was treated for an altered mental state and blunt head trauma after he was found "laying in middle of road" by law enforcement and was intoxicated.

- on July 22, 2015, the defendant (age 18) was treated for head trauma after he was reportedly struck in the head with a shovel.

- on April 23, 2016, the defendant (age 19) was admitted after sustaining two knife stab wounds to his abdomen. At the time of his admission, the defendant was intoxicated. He underwent surgery for repair of a small bowel laceration and mesenteric laceration and was later discharged on April 28, 2016.

Supp PSR §§ 14-21. Also at age 19, when he had been drinking, Mr. Clyde was "jumped" and hit in the head with a baseball bat. PSR § 80. The same medical records showed a long history of alcohol abuse. Supp PSR §§ 26-36. Not surprisingly, BOP records show Mr. Clyde has been diagnosed with an unspecified neurocognitive disorder along with several other physical ailments.

PSR § 82.

### B. Mr. Clyde's mental health diagnosis and prior conviction

On April 16, 2016, Mr. Clyde (then aged 19) killed Enrique Jesse Kayannie, also 19, on the Navajo reservation in Arizona. PSR § 33. Mr. Clyde hit Kayannie on the head with a baseball bat several times. Federal authorities charged Mr. Clyde with second-degree murder within Indian Country. *Id*. Initially, Mr. Clyde was found to be incompetent to stand trial and was sent to the BOP for competency restoration. *Id*.

Mr. Clyde reported to his examiner: "problems with his attention and concentration and noted a prior diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) for which he was prescribed Adderall as a child but stopped taking at age 18 because he did not like it. He further reported symptoms of racing thoughts, talking a lot, and staying awake all night, during which he would engage in risky behaviors such as climbing buildings. The defendant reported hearing voices when he was six years old, but that he no longer heard them. He stated that his brother had previously told him that he was frequently beaten in the head with closed fists when he was a child, with him reportedly sustaining a head injury from his mother's boyfriend. The defendant reported being struck in the head with an axe handle. The defendant also noted a general feeling that someone was trying to hurt him or set him up." PSR § 97.

While at FMC Butner for the forensic examination Mr. Clyde got into verbal and physical altercations with other inmates, explaining to his evaluator, "I don't know why I do it, homes. I just don't want to be disrespected." He further explained that he reacted to people who were exhibiting disruptive behavior and verbal aggression. PSR § 99. Also while at Butner, Mr. Clyde held a sharpened piece of metal to his neck and was placed on suicide watch for 8 days. PSR § 100.

The BOP examiner diagnosed Mr. Clyde with: "Antisocial Personality Disorder; Intermittent Explosive Disorder; Alcohol Use Disorder, Severe, in a controlled environment; Cannabis Use Disorder, Severe, in a controlled environment; and History of Attention Deficit Hyperactivity Disorder (ADHD), but not current." PSR § 96.

According to the Mayo Clinic:

> Intermittent explosive disorder involves repeated, sudden bouts of impulsive, aggressive, violent behavior or angry verbal outbursts. The reactions are too extreme for the situation. Road rage, domestic abuse, throwing or breaking objects, or other temper tantrums may be symptoms of intermittent explosive disorder.
>
> These explosive outbursts, which occur off and on, cause major distress. They can harm relationships and cause problems at work or school. They also can result in problems with the law.
>
> Intermittent explosive disorder is a long-term condition that can go on for years. But the severity of outbursts may lessen with age. Treatment involves talk therapy and medicine to help you control your aggressive impulses.

* * * * * * *

> Most people with this condition grew up in families where explosive behavior and verbal and physical abuse were common. Children who see or go through this type of violence at an early age are more likely to have these same traits as they grow up.
>
> * * * * * * *
>
> If you have intermittent explosive disorder, prevention is likely beyond your control unless you get treatment from a mental health professional.

https://www.mayoclinic.org/diseases-conditions/intermittent-explosive-disorder/symptoms-causes/syc-20373921 (last visited May 4, 2026).

Mr. Clyde was eventually restored to competency and pled guilty to the second-degree murder charge. In September 2018, Mr. Clyde was sentenced to 210 months' imprisonment followed by 5 years of supervised release. PSR § 33.

**C. USP Thomson and Mr. Clyde's killing of another inmate**

In late 2020 Mr. Clyde was being housed in the notorious Special Management Unit ("SMU") at United States Penitentiary Thomson. Like many inmates in the SMU Mr. Clyde was placed in double solitary confinement, which meant he was double celled with another inmate for 23 hours a day in a cell the size of a parking space. *See* Wash. Laws.' Comm. for Civ. Rts. & Urb. Affs. et al, *Cruel and Usual: An Investigation into Prison Abuse at USP Thomson* (July 2023), available at https://www.washlaw.org/wp-content/uploads/2023/07/Cruel-and-Usual-An-Investigation-Into-Prison-Abuse-at-USP-Thomson.pdf (last visited

May 5, 2026)).

As one might imagine, placing inmates with serious mental health issues in a tiny cell with another inmate for 23 hours a day has led to violence. *Id*. at 10. In 2017, when the SMU was housed at USP Lewisburg before moving to Thomson, the Department of Justice's Office of Inspector General issued a report criticizing BOP's treatment, or lack thereof, for seriously mentally ill inmates placed in the SMU. Office of the Inspector General U.S. Department of Justice, Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness, July 2017, https://oig.justice.gov/reports/review-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness. (last visited May 6, 2026). "Officials at Thomson exacerbated these problems by failing to provide even the most basic mental health care. Treatment instead consisted of one or two-minute psychology visits, approximately once a month. These 'meetings' would be conducted with the psychologist on one side of the cell door and the person in the SMU on the other. And in-between meetings, officials 'treated' people by providing them books or puzzles." *Cruel and Unusual*, at 10-11.

These issues, along with horrendous staff misconduct, resulted in the SMU becoming so violent and deadly that in February 2023, the BOP closed the unit. *See One of the deadliest federal prison units is closing*. https://www.npr.org/2023/02/14/1157035089/deadliest-federal-prison-

thompson-correctional-center-closing (last visited May 4, 2026). For a detailed report on the conditions in the SMU the Court can read: *How the Newest Federal Prison Became One of the Deadliest*, a report published by The Marshall Project and NPR. https://www.themarshallproject.org/2022/05/31/how-the-newest-federal-prison-became-one-of-the-deadliest (last visited May 4, 2026). The Court currently has another appeal from a death at USP Thomson before it in *United States v. Simonson*, No. 25-2530 (7th Cir.).

Mr. Clyde was housed with Edsel Badoni who was also a member of the Navajo Nation. PSR §§ 9-10. Badoni was serving a 166-month sentence for shooting his cousin in the chest three times. *See United States v. Badoni*, No. 12-cr-08262 (D. Arizona), R.111, 113, 122, 123. At about 2:15 a.m. on the morning of November 27, 2020, a BOP guard went to the door of Mr. Clyde's and Badoni's cell and saw Mr. Clyde standing in front of the cell door window. PSR § 11. The guard had Mr. Clyde turn on the light in the cell and saw Badoni lying on the floor in a pool of blood. PSR at 36. After other guards responded to the cell Mr. Clyde was secured and removed and Badoni was determined to be dead. Two metal shanks were found in the cell, one about ten inches with a cloth handle and the other about six inches with a rope handle. Pictures of the shanks were attached to the PSR at page 95.

Mr. Clyde had nine or ten puncture wounds to his chest, along with

scratches on his neck, abdomen, lower left forearm, and left thumb. PSR at 70, 72. An autopsy was performed on Badoni and his cause of death was determined to be multiple stab wounds to the neck and abdomen. PSR at 161-167. There were multiple stab wounds to Badoni's right jugular vein and carotid artery along with a stab wound to the head that penetrated into the skull bone but did not cause injury to the brain. *Id*. at 163, 167. There were multiple stab wounds to the chest, six of which penetrated into the chest cavity causing two stab wounds in the right lung and three stab wounds in the left lung. Additionally, there were stab wounds to the abdomen which caused injuries to the small bowel, small bowel mesentery, liver, and stomach. *Id*. at 164. Finally, there were multiple stab wounds to Badoni's back, left arm, left hand, and right forearm. *Id*.

### D. Mr. Clyde's prosecution

In June of 2022, a grand jury in the Northern District of Illinois returned a three-count indictment charging Mr. Clyde with second-degree murder, assault causing serious bodily injury, and possessing a prohibited object. R.3. In June 2025, Mr. Clyde pled guilty to Count 1, the murder charge, pursuant to a written plea agreement. R.52, 53. That offense carried a statutory maximum of life imprisonment. 18 U.S.C. § 1111(b). The government agreed to dismiss the remaining counts after sentencing. R.53.

#### 1. The guideline calculations and party's sentencing arguments

The initial presentence report calculated a base offense level of 38 with a three-level reduction for acceptance of responsibility, resulting in a total offense level of 35. PSR §§ 19, 26-28. Mr. Clyde had three criminal history points, resulting in a criminal history category of II. PSR § 34-36. That resulted in an advisory guideline range of 188 to 235 months' imprisonment. PSR § 127.

Prior to Mr. Clyde's guilty plea, he had been housed in the BOP. After the plea, he was housed at the Winnebago County jail. On October 17, 2025, Mr. Clyde got into a fight with another inmate at the jail. Supp PSR § 13. The fight was caught on video which showed Mr. Clyde approaching the other inmate who was sitting at a table in the common area of the housing unit. Mr. Clyde hit the other inmate on the head and the fight then moved out of the view of the security cameras. Guards used pepper spray to stop the fight. A metal shank made from a portion of chain link fence was found near where the fight occurred. The other inmate suffered a black eye and a shallow puncture wound below his right ear and behind his jaw. *Id*. The government submitted the video and pictures of the other inmate with its sentencing memorandum, labeling them exhibits A and B. R.65.

As a result of the fight, a Supplemental PSR was filed finding that Mr. Clyde had not accepted responsibility for his offense due to his continued criminal activity. Supp PSR § 11. That resulted in a total offense level of 38 rather

than 35 which resulted in a new advisory guideline imprisonment range of 262 to 327 months' imprisonment. Supp PSR § 38.

The government filed a sentencing memorandum asking the district court to vary upward to 450 months' imprisonment to run consecutively to the 210-month Arizona sentence Mr. Clyde was serving. R.65. The government based its request on the nature of the underlying offense, Mr. Clyde's prior murder conviction, the assault in the Winnebago County jail, and Mr. Clyde's BOP disciplinary history. *Id*.

Mr. Clyde filed a sentencing memorandum asking the district court to vary downward slightly to 230 months' imprisonment to run consecutively to the 210-month Arizona sentence for a total sentence of 440 months' imprisonment. R.66. Mr. Clyde stressed that he was currently 28 years old and had been sentenced to 17 ½ years in prison as a 19-year-old. He stressed his horrendous childhood and the mental illness that resulted. Mr. Clyde also argued that the conditions in the SMU at Thomson, which had been shutdown by that time, played a direct role in the offense. Finally, Mr. Clyde cited to the United States Sentencing Commission's report "The Effects of Aging on Recidivism Among Federal Offenders" finding that the risk of recidivism decreases as offenders age. *Id*. at 7.

**2. Mr. Clyde's sentencing**

The district court began the sentencing hearing by confirming there were

no factual objections to the PSR and no objections to the guideline calculations in the Supplemental PSR. App. 5-6. Accordingly, the parties agreed the statutory maximum was life imprisonment and the advisory guideline imprisonment range was 262 to 327 month's imprisonment. *Id.*

Consistent with its sentencing memorandum, the government argued the nature of murder and the specifics of Badoni's murder called for a lengthy sentence especially given Mr. Clyde's prior conviction for the same offense. App. 8-17. The government also argued that Mr. Clyde's disciplinary history in the BOP, set out in paragraphs 7 and 37-45 of the PSR, supported a lengthy sentence. App. 11-12. The government submitted the video of the Winnebago County jail assault along with photos of the other inmate to argue that assault also justified a higher sentence in addition to the increase in the guideline range from the loss of acceptance of responsibility. App. 8, 12-13. Finally, Badoni's sister and aunt gave victim impact statements explaining the impact Badoni's killing had on his family. App. 17-23.

Mr. Clyde began his sentencing argument by stressing 18 U.S.C. § 3553(a)'s parsimony principle, requiring the district court to impose a sentence sufficient, but not greater than necessary, to achieve the goals of sentencing. App. 24-25. He stressed his terrible upbringing, which even the government had acknowledged was horrific. App. 23. Mr. Clyde also pointed to his serious mental health issues,

including the diagnosis of the BOP. He argued that the consequences of housing an inmate with intermittent explosive disorder with another inmate in a tiny cell for 23 hours a day were predictable. App. 26-28. As defense counsel put it, "how the Bureau of Prisons could have thought that someone with my client's mental health record and someone with my client's various other behavioral issues, why it would be a good idea to have him confined 23 hours a day in a double-cell lockdown, it is very difficult to fathom." App. 28.

Mr. Clyde pointed out that he had been moved to USP Florence ADMAX, where he is not allowed to interact with other inmates at all, and therefore the risk of injury to other inmates was greatly reduced. App. 27. He also argued he had accepted responsibility for killing Badoni by asking his family to send him money so he could reimburse Badoni's family for a casket. App. 29-30.

Mr. Clyde argued his mental health issues reduced the need for retribution because they significantly interfered with his ability to make rational, "free" choices as compared to a defendant without those mental illnesses. At that point the Court interjected and had the following exchange with defense counsel:

> THE COURT: Okay. I don't want to get into a whole philosophical discussion, but if I accept your argument there -- sure, I take it as true, even though I necessarily don't do that -- as soon as you accept that argument, it bounces right over into likelihood to re-offend. That's the immediate response is, "Yeah, he has got mental health issues, it's terrible, so no retribution." But then I look at the other obvious factor, which is likelihood to re-offend, and if he has got mental health issues this significant, as you are saying, isn't he

much more likely to re-offend? And then it just washes out.

MR. MCLEESE: I understand that point, Judge.

THE COURT: Okay. Just making sure we are all on the same page.

MR. MCLEESE: I think if he were to get adequate mental health care in the Bureau of Prisons, that might go some distance.

THE COURT: How do they give him adequate mental health care if he is running around stabbing people to death?

MR. MCLEESE: I'm assuming that was a rhetorical question, Judge.

THE COURT: Well, if you want to answer. You don't have to answer.

App. 31-32.

In response, defense counsel noted that Mr. Clyde had been in the BOP for many years before he was subject to double celling under the extreme conditions of the SMU before stabbing Badoni. App. 32-33. These factors both helped explain the offense and supported the argument that Mr. Clyde's risk of recidivism could be reduced through proper mental health treatment and housing assignments.

The district court acknowledged its duty to impose a sentence sufficient, but not greater than necessary, to achieve the goals of sentencing and listed the § 3553(a) sentencing factors. App. 35-38. It acknowledged Mr. Clyde's terrible childhood but noted it had sentenced many defendants with terrible childhoods.

App. 36-37. The district court found that a "mechanical application of the guideline calculation [was] inconsistent with 3553(a), and I'm going to go over" to ensure Mr. Clyde would not kill again. App. 37.

The district court found the manner of Badoni's killing was "brutal, savage, barbaric, heinous" and gratuitous. App. 39-40. It found Mr. Clyde's history and characteristics showed repeated violence both before being sent to the BOP and while in the BOP. 40-41. It also stressed that this was Mr. Clyde's second homicide. App. 41. Because Mr. Clyde had killed someone before being sentenced to the BOP, the district court concluded "this is not a Thomson issue in large part. It's a Mr. Clyde issue. . . . I know what happened at Thomson and the horrific nature of Thomson. This isn't Thomson. This is Mr. Clyde, and that's the focus, is the focus is on the defendant and the appropriate sentence for Mr. Clyde under these circumstances." App. 42.

The district court again noted Mr. Clyde's "disadvantaged upbringing," saying it considered it "[b]ut I also consider it as a source of dangerousness and the need to protect the public, including other inmates in the Bureau of Prisons." App. 43. The district court rejected the idea that Mr. Clyde had shown any remorse for killing Badoni and the argument that recidivism decreases with age. The court noted it routinely sentenced defendants "north of 50" and it knew "what the statistics say, but I know what the reality is as well." App. 44.

Based on its consideration of the § 3553(a) factors the district court found "the answer to the question is life is necessary. Life is absolutely necessary. It is what is sufficient but not greater than necessary to serve these factors based upon the particular facts and circumstances of this case and Mr. Clyde. That's the answer to the question." App. 45. The district court did not impose a term of supervised release or a fine or restitution. App. 4.

## SUMMARY OF ARGUMENT

The district court's upward variance to a sentence of life imprisonment was both procedurally and substantively unreasonable. A life sentence is extreme, only 0.2 percent of federal offenders receive life sentences. A district court commits procedural error when it fails to adequately explain why an extreme variance is necessary to comply with the sentencing goals set forth in 18 U.S.C. § 3553(a). And that's what happened here. Mr. Clyde's killing of Badoni was a very serious crime deserving of significant punishment. That is why his advisory guideline imprisonment range was 262 to 327 months. The district court failed to adequately explain why that already extreme sentencing range, running consecutively to Mr. Clyde's Arizona sentence, was not sufficient to punish Mr. Clyde.

The district court committed additional procedural error when it found Mr. Clyde's serious mental health issues could not be mitigative because they increased his risk to recidivate. This approach to mental illness, part of any defendant's history and characteristics, fails to recognize that adequate mental health treatment can mitigate the risk of recidivism created by the mental illness. The district court committed further procedural error when it refused to find that the deplorable conditions in the Special Management Unit at USP Thomson played *any* role in Mr. Clyde's offense. The SMU was a hell hole. BOP personnel

locked a defendant suffering from intermittent explosive disorder in a parking space sized cell with another inmate for 23 hours a day. The results, sadly, were predictable. Mr. Clyde is responsible for his criminal conduct, but it was not reasonable for the district court to ignore the BOP's role in creating the conditions that led to Mr. Clyde's offense.

The district court's sentence of life imprisonment was also substantively unreasonable. That sentence was significantly longer than the five other defendants sentenced for second-degree murder with offense levels of 38 and criminal history categories of II in the last five fiscal years. Those defendants received an average sentence of 294 months' imprisonment and all of them received within guideline sentences. Mr. Clyde is the only defendant in that category sentenced above the guideline range. In the end, a life sentence for a defendant who pleaded guilty, has serious mental health issues caused by a horrific childhood, and who was placed in a parking space sized cell with another inmate for 23 hours a day is too long.

## ARGUMENT

**The district court's upward variance from a guideline range of 262 to 327 months' imprisonment to life imprisonment was both procedurally and substantively unreasonable.**

### A. Standard of Review and Legal Standard

This Court reviews "*de novo* a procedural challenge to a defendant's sentence." *United States v. Ballard*, 950 F.3d 434, 436 (7th Cir. 2020). It reviews the substantive reasonableness of a criminal sentence for an abuse of discretion. *United States v. Campbell*, 37 F.4th 1345, 1352 (7th Cir. 2022).

While a district court has discretion to sentence a defendant outside the recommended guideline range, "when doing so, the judge must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *Ballard*, 950 F.3d at 436 (cleaned up). This is so because the Supreme Court has found "it uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Gall v. United States*, 552 U.S. 38, 50 (2007). "It follows that more significant justification is necessary for more substantial departures." *Ballard*, 950 F.3d at 436 (citing *United States v. Castillo*, 695 F.3d 672, 673 (7th Cir. 2012) and *United States v. Miller*, 601 F.3d 734, 739 (7th Cir. 2010)). "Failing to adequately explain a chosen sentence, including an explanation for deviation from the Guidelines range, is a procedural error." *Id.* at 437.

The Court will determine a sentence is substantively reasonable "if the district court gives meaningful consideration to the factors enumerated in 18 U.S.C. § 3553(a). . . and arrives at a sentence that is objectively reasonable in light of the statutory factors and the individual circumstances of the case." *United States v. Rosen*, 726 F.3d 1017, 1027 (7th Cir. 2013). Or, as the Tenth Circuit has framed the issue, "[s]ubstantive reasonableness considers 'whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a).'" *United States v. Guevara-Lopez*, 147 F.4th 1174, 1184 (10th Cir. 2025) (*quoting United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009)). While substantive reasonableness review is deferential, it is not a rubber stamp. *United States v. Rigas*, 583 F.3d 108, 122 (2d Cir. 2009); *United States v. Guevara-Lopez*, 147 F.4th 1174, 1184 (10th Cir. 2025). "Simply put, a defendant's sentence is substantively unreasonable if it is too long." *United States v. Lee*, 974 F.3d 670, 676 (6th Cir. 2020).

**B. The district court committed procedural error by failing to adequately explain its dramatic variance from the applicable guideline range to a sentence of life imprisonment.**

The district court's upward variance was truly dramatic. It went from 327 months, 27.25 years, to *life* for a 28-year-old defendant. To try and put that increase in perspective, consider Mr. Clyde's life expectancy. According to Social Security Actuarial Life Table, the life expectancy of a 28-year-old male is 48.31

years, or 579.72 months. https://www.ssa.gov/oact/STATS/table4c6.html.

The extent of the district court's variance was not just extreme, the sentence imposed, life, is itself extreme. In July 2022 the United States Sentencing Commission issued a report entitled, "Life Sentences in the Federal System." https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Life.pdf . The Report found that for Fiscal Years 2016 through 2021 "709 offenders were sentenced to life imprisonment which accounted for 0.2 percent of the total federal offender population." *Id.* at 2. Just under half of those defendants had been convicted of murder, although the study does not distinguish between grades of murder. This is important because first-degree murder is covered by U.S.S.G. § 2A1.1, which has a base offense level of 43 which results in a guideline range of life no matter the defendant's criminal history category. *Id.*

The Sentencing Commission's Judiciary Sentencing Information ("JSIN") tool shows the importance of distinguishing between first- and second-degree murder in this context. https://jsin.ussc.gov/analytics/saw.dll?Dashboard. JSIN allows a user to select the applicable primary guideline and then click on the applicable cell of the Sentencing Table corresponding to the defendant's offense level and criminal history category and receive the number of defendants sentenced under that guideline in that cell for the past five fiscal years and the

average sentence length as well as the median sentence length. *Id*. The Sentencing Commission created the JSIN database in 2021 "at the request of judges" to "provide[ ] quick online access to sentencing data for similarly situated individuals." United States Sentencing Commission, Annual Report 2023, https://www.ussc.gov/about/annual-report-2023 (last visited May 6, 2026).

For first-degree murder, which has § 2A1.1 as the primary guideline, during the previous five fiscal years there were 46 defendants sentenced at offense level 43 (the base offense level) and criminal history category II. All 46 received sentences of imprisonment. The average length of sentence imposed was 399 months and the median length of sentence imposed was 470 months (the Commission treats a life sentence as 470 months). *Id*.[2] There were 131 defendants with base offense level 43 and criminal history category I and the average length of sentence imposed was 414 months while the median length of sentence imposed was 470 months.

Second-degree murder is covered by § 2A1.2, which has a base offense level of 38. During the previous five fiscal years, six defendants were sentenced under § 2A1.2 with an offense level 38 and criminal history category II. All six

[2] For all the JSIN calculations in this brief counsel selected either § 2A1.1 or § 2A2.2 as the primary guideline and then selected the Sentencing Table cell corresponding to the stated offense level and criminal history category.

received sentences of imprisonment. The average sentence was 294 months, and the median sentence was 314 months. There were eight defendants sentenced with offense level 38 and criminal history category I. The average length of sentence imposed was 263 months while the median length of sentence imposed was 237 months. Even the four defendants convicted of second-degree murder and sentenced at offense level 38 with a criminal history category VI had an average sentence length of 385 months and a median sentence length of 415 months.

Clearly, there are many more defendants sentenced for first-degree murder than second-degree murder. Additionally, the majority of those defendants, even those in criminal history category I, received life sentences. These statistics further highlight how extreme a life sentence is in the federal criminal system even for a defendant convicted of second-degree murder. And even for a defendant convicted of second-degree murder who falls into the highest criminal history category. No matter how the Court looks at it, the district court's variance to a sentence of life imprisonment was extreme.

While the district court discussed the § 3553(a) factors, it failed to give an adequate explanation for the extent of its upward variance to life. This is especially true given that the district court had the option to make Mr. Clyde's sentence in this case run consecutively to his Arizona case. A sentence at the top

of the guideline range, 327 months, running consecutive to the 210-month Arizona sentence would have resulted in a total sentence of 437 months' imprisonment. That's 36 and a half years. Of course the district court could have varied upward from 327 months but not all the way to life.

The district court also failed to adequately consider Mr. Clyde's history and characteristics when it found that Mr. Clyde's mental health issues could not be mitigating because they increased his risk of recidivism. App. 32. The district court treated Mr. Clyde's mental health issues as a zero-sum factor that was "washe[d] out" by the risk of recidivism based on his mental health issues. What the district court failed to realize, or accept, was that the risk of recidivism that may come from a person's mental health issues can be addressed through proper treatment. When Mr. Clyde made this point the district court dismissed it out of hand with a pejorative exclamation of "How do they give him adequate mental health care if he is running around stabbing people to death?" App. 32. Mr. Clyde pointed out to the district court that he had been in the BOP for almost two years at the time of the stabbing and had "stabb[ed] people to death" on exactly one day of those two years. App. 32.

More importantly, the district court refused to consider that if the BOP had actually given Mr. Clyde proper mental health treatment and housed him appropriately based on his mental health diagnosis, he may not have stabbed

another inmate to death. And, with proper mental health treatment and appropriate housing, the risk of recidivism could be dramatically reduced. Recall, the Mayo Clinic's observation that, "[i]ntermittent explosive disorder is a long-term condition that can go on for years. But the severity of outbursts may lessen with age. Treatment involves talk therapy and medicine to help you control your aggressive impulses." https://www.mayoclinic.org/diseases-conditions/intermittent-explosive-disorder/symptoms-causes/syc-20373921.

Finally, the district court's refusal to acknowledge that the obscene conditions of the SMU at USP Thomson played a part in Mr. Clyde's offense was error. Of course prison conditions are not a defense to criminal responsibility when an inmate kills another inmate. But they can be mitigating circumstances when it comes to sentencing. And the fact Mr. Clyde was serving a sentence for second-degree murder does not mean Thomson's obscene conditions and the BOP's decision to house an inmate with intermittent explosive disorder with another inmate in a cell the size of a parking space for 23 hours a day did not play a role in the offense. Had the BOP provided adequate treatment and housing this offense would not have happened. The district court's insistence that this killing was "not a Thomson problem" is indefensible. This offense is part of the reason why USP Thomson was closed. This tragic killing was entirely foreseeable and if any private actor had engaged in this conduct they would have

been sued out of existence.

None of this is to say Mr. Clyde is the victim in this case. Badoni is the one who is dead. But the district court's refusal to acknowledge that the conditions at Thomson played *any* role in this tragedy was unreasonable. When linked with the district court's refusal to acknowledge that proper mental health treatment could address the risk of recidivism, and its refusal to adequately explain why a variance all the way to life imprisonment was required, amounts to procedural error.

**C. The district court's extreme variance to a sentence of life imprisonment was substantively unreasonable.**

In addition to the district court's procedural error, which itself requires vacating Mr. Clyde's sentence and remanding for a new sentencing, the district court's imposition of a life sentence was substantively unreasonable. Mr. Clyde knows this issue is reviewed for an abuse of discretion, and this Court has very rarely found a sentence substantively unreasonable. But very few sentences involve upward variances from the guidelines and fewer still involve an upward variance to life imprisonment. As the previously discussed statistics show, only about 0.2 percent of federal offenders are sentenced to life imprisonment. We are talking about the extreme here.

Since the sentence is not within the guideline range, the Court cannot presume that it is reasonable. *Rita v. United States*, 551 U.S. 338, 347 (2007). While

the Court cannot presume the life sentence is unreasonable simply because it is higher than the guideline range, *Id*. at 354-55, *Gall* makes clear that the extreme nature of the variance requires a more searching reasonableness review. *Gall*, 552 U.S. at 50.

The JSIN statistics discussed *supra* show the district court's sentence was too extreme. *See Guevara-Lopez*, 147 F.4th at 1184-85 (using JSIN data to find sentence substantively unreasonable). JSIN statistics are finely tuned to provide meaningful comparisons of sentences with defendants with the same primary guideline, offense level, and criminal history category. This distinguishes them from broad, general sentencing statistics involving types of crimes or defendants. *Id*. The JSIN data shows that in the past five fiscal years six defendants were sentenced with primary guideline 2A1.2, offense level 38 and criminal history category II. Of those six defendants 83% received within guideline range sentences while 17% received an upward departure or variance. That means one defendant received an upward departure (1 ÷ 6 = 16.6666%). That one defendant was Mr. Clyde.

Furthermore, to the extent the Court believes the district court's finding that Mr. Clyde's mental illness could not be mitigative because it was "washe[d] out" by the increased risk of recidivism is a substantive rather than procedural challenge, the arguments Mr. Clyde previously made support a finding of

substantive unreasonableness. The district court's refusal to even acknowledge that proper treatment of Mr. Clyde's mental illnesses could reduce his risk of recidivism was not reasonable. The same holds true for the district court's refusal to acknowledge that the horrific conditions at Thomson played a role in the offense. It was not reasonable for the district court to find those horrendous conditions played *no* role in the offense.

Finally, Mr. Clyde pled guilty; he did not put the government to its burden of proof at a trial. That admission of guilt shows an acceptance of responsibility separate and apart from the guideline's acceptance of responsibility reduction. *See* U.S.S.G. § 3E1.1. Mr. Clyde did not receive that reduction due to the Winnebago County assault, but that does not mean Mr. Clyde's admission of guilt is unworthy of some consideration at sentencing. The Sentencing Commission's study on life sentences revealed that three quarters of the defendants sentenced to life imprisonment went to trial, which is 30 times higher than the 2.3 percent trial rate for all other offenders. Life Sentences in the Federal System at 2. A sentence of life imprisonment for a defendant who pled guilty and faced a guideline range of 262 to 327 months' imprisonment is "too long." *Lee*, 974 F.3d at 676. The district court's sentence of life imprisonment is substantively unreasonable and therefore must be vacated.

## CONCLUSION

For the foregoing reasons the Court should vacate Mr. Clyde's sentence and remand for resentencing.

Respectfully submitted,
THOMAS W. PATTON
Federal Public Defender

s/ Thomas W. Patton
THOMAS W. PATTON
Federal Public Defender

Attorneys for Defendant-Appellant,
HOUSTON CLYDE

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)**

The undersigned certifies that this brief complies with the volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32 in that it contains 6,657 words and 628 lines of text as shown by Microsoft Word 2016 used in preparing this brief.

s/ Thomas W. Patton
THOMAS W. PATTON

Dated: May 7, 2026

No. 25-3343

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

HOUSTON CLYDE,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 3:22-cr-50034
The Honorable Judge Iain D. Johnston

REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, HOUSTON CLYDE

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
401 Main Street, Suite 1500
Peoria, Illinois 61602
Telephone: (309) 671-7891
Fax: (309) 671-7898
Email: Thomas_Patton@fd.org

THOMAS W. PATTON
Federal Public Defender

Attorneys for Defendant-Appellant,
Houston Clyde

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

The undersigned counsel for Defendant-Appellant, hereby states that all of the materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix to this brief.

s/ Thomas W. Patton
THOMAS W. PATTON
Federal Public Defender

Date: May 7, 2026

**APPENDIX TABLE OF CONTENTS**

Certification .......... App. ii

Transcript of Proceedings – Sentencing held December 17, 2025 .......... App. 1-47

Judgment in a Criminal Case .......... App. 48-51

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

UNITED STATES OF AMERICA, ) Case No. 22 CR 50034-1
)
v. )
)
)
HOUSTON A. CLYDE, ) Rockford, Illinois
) December 17, 2025
Defendant. ) 1:39 p.m.

TRANSCRIPT OF PROCEEDINGS - SENTENCING
BEFORE THE HONORABLE IAIN D. JOHNSTON

APPEARANCES:

For the Government: HON. ANDREW S. BOUTROS
UNITED STATES ATTORNEY
BY: MS. JESSICA S. MAVEUS
Assistant United States Attorney
327 S. Church Street, Suite 3300
Rockford, Illinois 61101

For the Defendant: LAW OFFICE OF RICHARD H. MCLEESE
BY: MR. RICHARD H. MCLEESE
53 W. Jackson Boulevard, Suite 1452
Chicago, Illinois 60604

Also Present: MS. TORI POWELL
Probation Department

Court Reporter: HEATHER PERKINS-REIVA, BSRR, RDR, CRR
Official Court Reporter
327 S. Church Street, Room 5406
Rockford, Illinois 61101
Telephone: (779) 772-8309
heather_perkins-reiva@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: 22 CR 50034-1, *USA v. Houston Clyde*.

THE COURT: All right. Let's get appearances for the record starting with the government.

Hold on one second.

I will let Mr. McLeese get to the podium.

All right.

MS. MAVEUS: Good afternoon, Your Honor. Jessica Maveus for the United States.

THE COURT: Good afternoon, Ms. Maveus.

MR. MCLEESE: Good afternoon, Judge. Richard McLeese on behalf of Mr. Clyde, who is present before the Court.

THE COURT: Good afternoon, Mr. McLeese.

And we have a representative from probation.

MS. POWELL: Good afternoon, Judge. Tori Powell with U.S. Probation.

THE COURT: Good afternoon, Ms. Powell.

MR. MCLEESE: If I may have one moment, Judge?

THE COURT: Sure.

(Brief pause.)

MR. MCLEESE: Thank you.

THE COURT: You're welcome.

Ms. Maveus, are you ready to proceed?

MS. MAVEUS: Yes, Your Honor.

THE COURT: And, Mr. McLeese, are you ready to

proceed?

MR. MCLEESE: Yes, Judge.

THE COURT: Mr. Clyde, are you ready to proceed?

DEFENDANT CLYDE: Yes, sir.

THE COURT: All right. I'm going to swear you in. So to the extent you can, raise your right hand, sir.

Thank you.

(Defendant sworn.)

THE COURT: Okay. All right. Mr. Clyde, at the change of plea, I asked you if you were satisfied with Mr. McLeese's representation of you, and at that time you told me you were. Are you still satisfied with his representation of you?

DEFENDANT CLYDE: Yes, sir.

THE COURT: All right. So to summarize how we got to today's proceedings, there was an indictment on June 28th, 2022, an initial appearance on July 28th, 2022, and then the change of plea on June 9th of 2025. At the change of plea, I identified the maximum statutory punishments for the offense that Mr. Clyde has pled guilty to.

The maximum statutory term of incarceration is life, the maximum fine is $250,000, supervised release maximum term of five years, special assessment of $100, and at that time I noted that the offense is not a probationable offense. Probation is not available.

We will come back at the end of this to the government's motion to dismiss Counts 2 and 3. Just putting a placeholder there to remind counsel to do that.

I will tell you what documents I have read for today. There is the plea agreement; that's docket entry 53. The presentence investigation report; that is docket entry 55. There is a supplemental report by the probation department, by Ms. Powell; that's docket entry 62. The government's memorandum; that's docket entry 65. The defendant's memorandum; that's docket entry 66. And then I think it was yesterday, there was a filing called -- I will say it is defendant's authorities. I will just read what it is here: "Defendant's Submission of Authorities That May Be Cited At His Sentencing Hearing." That's docket entry 69.

Ms. Maveus, is that what you have?

MS. MAVEUS: Yes, Your Honor.

THE COURT: Mr. McLeese, is that what you have?

MR. MCLEESE: Yes, Judge.

THE COURT: Okay. All right. One of the documents I have identified a couple times now is the presentence investigation report as well as the supplemental report. The supplemental report, again, is docket entry 62. The PSR is 55.

Mr. Clyde, have you had the opportunity to read the presentence investigation report or have it read to you?

DEFENDANT CLYDE: Yes, sir.

THE COURT: Okay. Mr. McLeese, have you had the opportunity to review the presentence investigation report with Mr. Clyde?

MR. MCLEESE: Yes, Judge.

THE COURT: Okay. I did not see any factual challenges to the PSR on behalf of the government. Were there any that I missed?

MS. MAVEUS: No, Your Honor.

THE COURT: Mr. McLeese, I did not see any factual challenges to anything in the PSR. Were there any?

MR. MCLEESE: No.

THE COURT: Okay. As to the government -- and, again, we are going to -- there was two calculations, advisory guideline calculations. There was the initial one in the PSR, and then in the supplemental PSR, docket entry 62, there was a recalculation based upon the removal of the three-level acceptance of responsibility. So we ended up with the supplemental report, docket entry 62, with an offense level calculation of 38 and a criminal history category of II.

Ms. Maveus, were there any objections from the government as to the guideline calculations in the supplemental report?

MS. MAVEUS: No, Your Honor.

THE COURT: Mr. McLeese, were there any objections from the defendant as to the guideline calculations in the

supplemental report that result in an offense level of 38 and a criminal history category of II?

MR. MCLEESE: No, Judge.

THE COURT: Okay. So I think, then, we all agree that the advisory guideline range is 262 months to 327 months for the advisory guideline range.

Is that correct, Ms. Maveus?

MS. MAVEUS: Yes, Your Honor.

THE COURT: Is that correct, Mr. McLeese?

MR. MCLEESE: Yes, Judge.

THE COURT: Okay. So the Court will adopt the facts in the presentence investigation report as reliable and based on detailed information.

So, Mr. Clyde, at this point, let me tell you how it is going to proceed. It is my understanding there is victims who might be making statements or presenting information. I will hear from those people. I will hear from the government. I will hear from your attorney, Mr. McLeese. Then I will hear from the government. And then you will have the right to make a statement. You don't have to make a statement, but if you want to make a statement, I will be glad to hear you. If you don't make a statement, I don't hold that against you as a showing of a lack of remorse. So that's how it is going to proceed going forward, Mr. Clyde.

Ms. Maveus, it's my understanding there might be

victim statements; is that correct?

MS. MAVEUS: That is correct, Your Honor.

THE COURT: All right. So who do we have?

MS. MAVEUS: In this instance, I would ask to have them present their statements at the end of my argument, if that's okay with the Court.

THE COURT: That's fine. That's fine.

Okay. So are you ready to address the 3553(a) factors?

MS. MAVEUS: Yes, Your Honor.

THE COURT: And, Mr. McLeese, are you ready to address the 3553(a) factors?

MR. MCLEESE: Yes, Judge.

THE COURT: Okay.

MR. MCLEESE: But it's my understanding that she would be arguing, and then I thought the expectation was that the witnesses would testify or speak to the Court, and then I would argue.

THE COURT: Okay. I think I just covered this.

MR. MCLEESE: Okay.

THE COURT: I will hear from the government, and then I will hear from you, and then I will hear from the government, and then I will hear --

MR. MCLEESE: Okay.

THE COURT: Not a problem. Not a problem. I know

everybody does it a little different. That's just how we do it here.

Give me a second, Ms. Maveus.

(Brief pause.)

THE COURT: All right. Whenever you are ready.

MS. MAVEUS: Thank you, Your Honor.

Defendant is here before this court today for his second murder. Defendant is currently serving a sentence of imprisonment of 17-and-a-half years, 210 months, for a murder that he committed in Tuba City, in Arizona, in April of 2016, having been sentenced in 2019.

Just shortly four years after his first murder, defendant committed a second murder. He is 28 years old with a body count of two.

I had submitted to the Court Exhibits A and B which were from an incident at the Winnebago County Jail. I believe Your Honor had reviewed those in advance of today.

THE COURT: I have.

MS. MAVEUS: Thank you.

And defendant is asking for a downward departure, but there is no basis, none that exists, for a downward departure, rather there is a significant basis and aggravation for this Court to impose an above-guidelines sentence in consideration of the 3553(a) factors, along with the defendant's criminal history, criminal conduct in the Bureau of Prisons, and because

of the nature of the injuries and the infliction of harm to the victim.

Your Honor, this was more than a killing. It was a vicious and brutal stabbing to death with so many inflicted injuries. There are barely any signs of defensive wounds to Edsel Badoni. The autopsy photos were submitted along with the presentence report, and because of the family's attendance and the graphic nature of those photos, I'm not going to display them in court today.

The Court is very familiar with USP Thomson and the SMU program which was in place in November of 2020 when this occurred. This happened in a locked room. Edsel Badoni had no escape, he had no retreat, and there is no question that Badoni was stabbed to death over 100 times, left in a pool of blood on the cell floor where he was found by staff.

The murder weapons, Your Honor, I have them here in court. I would ask for Agent Jeremy Smith to approach on my side of the courtroom, with the marshal's permission, to show the Court the weapons that were used to kill Edsel Badoni.

THE COURT: All right. Mr. Miller, are you okay with this?

THE MARSHAL: Yes, sir.

THE COURT: Okay. All right. You can approach.

MS. MAVEUS: And for the record, these are two singular metal shanks, metal rods, one approximately 10-inches

long and one approximately 6-, 6-1/2-inches long, that are sharpened to a point at one end. And, Your Honor, those weapons weigh nothing. These were jailhouse shanks that were fashioned into dangerous weapons. They were not knives created by skilled craftsmen with a wooden handle. And as Your Honor saw in the photographs from the crime scene which were attached to the PSR, each individual shank was wrapped with orange cloth or string and included a lanyard for easy handling.

Those weapons were made from parts of a shower grate inside the shower cells at USP Thomson. They were referred to as "floaters" by inmates because they could float around the prison with these weapons without being detected, yet defendant used enough force to pierce Edsel Badoni's skull with a weapon that essentially weighs nothing and stab him in the diaphragm area, the stomach, and the right side of the neck. It's like killing someone with a pencil.

No murder is excusable, but this is not a shooting. The first murder was not a shooting. It is not motivated by gang violence. They were vicious murders. The first murder, in the first murder, the demonstration of violence by the defendant against another human being, he beat that young man to death with a baseball bat to the point that his face and head were deformed, and his mother had to retrieve his teeth from the grass, and he is being punished for that.

The murder of Edsel Badoni is equally horrifying.

When this Court views the autopsy photos, there is a concentration of stab wounds, poke wounds, with one of these weightless shanks over 100 times that pierced organs, that pierced Edsel Badoni's lung, his jugular, his carotid artery. There is no indication of what stab wound killed him, but what is very clear from those photos is that there are minimal defensive wounds, perhaps one on each knuckle of the back of Badoni's hands. There is a photograph of the defendant with some superficial wounds and a very obvious scratch mark across his abdomen.

So the defendant comes before this Court a recidivist murderer in some of the most heinous circumstances, and he has a very lengthy criminal history beginning when he was 13 years old. And that timeline is very important when looking at the entirety of the defendant's criminal history, including his conduct in the Bureau of Prisons.

Since his incarceration in July of 2016 for the first murder incident, defendant has racked up approximately 25 incidents in the Bureau of Prisons and some in the local jails where he has been held. Several of those involve weapons possession, attacks on other inmates, unprovoked attacks on other inmates, and damage to government property.

Just by way of example, in 2017, the defendant was charged in the Bureau of Prisons for at least three incidents of fighting and assault. In 2018, two assaults, one in which

he struck another inmate with a lock in a sock causing lacerations and a hematoma. 2019 -- every year, every year since he has been incarcerated, he has incurred infractions in the Bureau of Prisons. 2019, an assault and shank offenses. And in 2020, horrifyingly enough, on September 30th, he was, just two months before he murdered Edsel Badoni, found with four shanks at USP Thomson. And he didn't stop there. He committed the murder in November of 2020. And then in 2021 and 2022, he continued to have problems by refusing orders, barricading himself in his cell, covering his cell window, and having to be removed from his cell with force.

In 2023, he struggled with those same orders. He broke a sprinkler head inside one of the prison cells. And in 2024, once he arrived at the Winnebago County Jail, he had an incident in the jail where he refused to lock down and baited the officers, saying, "Spray me, spray me," and he got sprayed with OC spray. And then in 2025, earlier this year, he was caught with burnt wicks and a torn sheet. I have no idea what he was necessarily going to do with that.

But the most recent incident in October of 2025, bearing some similarity to the circumstances of Edsel Badoni's murder, is when the defendant somehow came into the possession of a sharpened object, a piece of fencing meant to protect a former laundry area in the jail, in a pod where all of these inmates -- federal inmates, local inmates -- are held together

for recreation time. They are sitting in chairs. They are sitting at tables. They are playing chess. They are playing cards. They are watching TV. And it was during that time that the defendant took the shank made from the fence and, unprovoked, attacked another inmate, a local jail inmate, by punching him in the face and stabbing him with that sharpened object, causing absolute chaos in the pod. And if Your Honor was able to watch the body-worn cam, you saw the other inmates being ordered to lay down, stay still, blood on the floor, until Winnebago County Jail corrections officers could find the shank and collect it and get everybody moved back to their cells.

If that had happened in a locked jail cell, the government is not confident there would have been anything to stop the defendant from stabbing that inmate to death or causing serious bodily injury. By the grace of God, he did not suffer serious bodily injury, other than the black eye.

Based on a review of the defendant's history in the Bureau of Prisons --

THE COURT: You mean the victim had a black eye?

MS. MAVEUS: The victim had a black eye.

THE COURT: But there was also a puncture wound?

MS. MAVEUS: There was a puncture wound behind his ear.

THE COURT: Yes.

MS. MAVEUS: And there was also a puncture wound to his shoulder area, but he did not need outside treatment.

THE COURT: Correct.

And for the record, I'm pointing to the same area on my body that Ms. Maveus is pointing to on her body, the shoulder, neck, ear area.

Go ahead.

MS. MAVEUS: Thank you, Your Honor.

Administratively, the defendant has spent approximately 188 days in segregation because of these offenses, and he has lost good time credit of approximately 455 days.

In reviewing the defendant's history, Your Honor will note that he himself has, of course, been victimized numerous times because of his substance abuse, his upbringing. What is interesting and noteworthy is that the defendant himself was stabbed in the stomach approximately 12 times in 2016 and nearly died. He had to have major surgery to essentially piece his internal organs back together. So he knows the harm that multiple stab wounds to vital organs can cause.

As I said earlier, the Court is familiar with how USP Thomson was structured and the procedures in place in 2020 in the SMU unit and also the dangerousness of the defendants and the inmates who were held there. The Court is also aware of the impact that serious assaults and murders have and have had

on Thomson as a whole.

Speaking to general deterrence, federal inmates must know that they will be prosecuted and they will be held accountable for attacking other inmates, for possessing dangerous weapons, for attacking staff, and for causing chaos inside of a federal prison. Federal inmates must be deterred from resisting those who are charged with keeping them safe and healthy.

The challenge here is what type of sentence will deter the defendant. The government is not convinced that a guidelines sentence, let alone a below-guidelines sentence, will deter defendant, as evidenced by his recent incident in the Winnebago County Jail where he essentially committed nearly the same type of conduct.

In our sentencing memo, the government laid out that approximately 15 of those BOP incidents would have been chargeable incidents in federal court. If they occurred in Thomson, they would have been prosecutable here. Each possession of shank, each possession of weapon could have been charged as a felony offense to which defendant could have been sentenced to anywhere from 15 to 21 months.

As far as each assault, those would have been misdemeanor assault charges, with the exception of the lock-in-the-sock incident and perhaps the recent incident where defendant possessed the weapon and committed the assault of the

jail inmate. There is so much unaccounted for conduct between 2017 and 2025 that defendant truly should be in criminal history category VI, which allows the Court to go to the far side of the guidelines table.

But in addition to defendant's unaccounted for criminal history, which would allow the Court to step up, essentially, in the guidelines range, the nature and circumstances of the injuries inflicted to Edsel Badoni were so extreme and so severe. The government has provided some case law examples for Your Honor in similar cases where courts have essentially added offense level or offense levels because of the nature and circumstances of the injuries inflicted, gratuitous infliction of injury, and that's what happened here, Your Honor.

The sheer number of stab wounds, the fact that the defendant was able to stab Edsel Badoni through the skull, he was stabbed in the back, in the legs, in the arms, but the main areas of those stab wounds being the right side of the neck and the middle of the body, this was not a fight. Edsel Badoni didn't stand a chance against the defendant. And the DNA on those two weapons speaks volumes that the victim's blood, DNA was recovered from both of those weapons. Defendant's DNA was recovered on the 10-inch weapon, but not on the 6-inch weapon. It is the government's position that he inflicted self-inflicted wounds either during or after the incident.

The government has certainly acknowledged that the defendant had a horrific upbringing and a horrific childhood, but there are many people who come into this court and there is many people who walk around outside of this court who have horrific childhoods and don't commit murder, let alone a second murder.

So in consideration of those factors, Your Honor, the government is proposing a sentence of 450 months' imprisonment.

I would like at this time to invite Erika Badoni, Edsel Badoni's sister, and his aunt, Carol Yazzie, to come up and address the Court on behalf of the victim's family.

THE COURT: All right. Ms. Badoni and Ms. Yazzie, if you want, you can come on up.

MS. MAVEUS: So this is Ms. Erika Badoni. This is Ms. Carol Yazzie.

THE COURT: Take your time.

MS. BADONI: Good day, everyone.

My name is Erika Badoni, and I am the sister of Edsel Aaron Badoni. You all know him as Inmate No. A2256008, the victim in this case, but to me he was so much more. He was a human being. He was my older brother, protective and considerate. Our parents had three children. Edsel was the eldest, followed by myself, and then our younger brother, Eric.

Growing up, Edsel took on the role of caretaker while our parents worked. He made sure we had food to eat and looked

after us with a sense of responsibility beyond his years. Even into high school and adulthood, Edsel remained the protective older brother, always checking in to make sure we were safe, making good decisions. We were raised in a home filled with love, and he carried that love into everything he did, especially when it came to our mother. He would go out of his way to help her, whether it was chopping wood for the winter or walking through rain and mud just to make sure she got home safely. He always promised our mother that he would take care of her as she grew older, and she always held on to that belief.

Sadly, it was that same protective nature that led to the circumstances that put him behind bars, but even while he was incarcerated, we never lost our connection. We stayed in touch, and he remained a constant presence in our lives. Losing my brother has been incredibly difficult to come to terms with. Just a week before his passing, I found out I was pregnant. Sadly, I never got the chance to share that joyful news with him.

Due to cultural traditions, I wasn't able to attend his funeral or take part in most of the planning as it is believed that doing so could harm my own unborn child. To make things even harder, we had to wait weeks to lay him to rest, something that deeply conflicted with our cultural practice of burying the deceased within four days. The grief and stress

took a toll on my health. My doctors were concerned about a risk of a miscarriage, so I had weekly checkups until I reached my second trimester. When I was told my due date would be July 21st, the day before his birthday, I was overwhelmed with sadness.

People often say our loved ones are watching over us or with us in spirit, and I try to hold on to that, but it still hurts knowing I will never hear his reaction to my pregnancy or see him hold his niece. My daughter will grow up never knowing her uncle, and that's a loss I carry with me every day.

The deepest pain my brother's passing left behind was carried by our mother, Evelyn. She was diagnosed with polycystic kidney disease in 1990 and continuously defied the odds for decades. Despite doctors warning her that she would eventually need dialysis or a kidney transplant, she remained very healthy. Year after year, her doctors would tell her, "Whatever you are doing, keep doing it." But after my brother's death, everything changed. The loss broke something in her as she became withdrawn, depressed, and began neglecting her health. By 2022, her nephrologist strongly urged her to begin dialysis. She refused for as long as she could, but by 2024, her health had declined to the point where she had no choice but to start treatment. The emotional weight of her grief had taken a serious toll on her overall health. Every

July, his birthday month, and every November, the month he passed, were especially hard for her.

But in July 2024, something shifted. We assumed she was going through another difficult season of grief as she had in previous years. However, this time was very different. Her behavior changed drastically, and it was as if she wasn't herself anymore. After a four-week hospital visit, we finally received a diagnosis in August 2024: dementia. The psychiatrist who evaluated her during this hospital stay noted that she often spoke about her son, that she was still carrying the weight of his loss. Every hospital visit and behavioral health appointment since then echoed the same thing. Her mind couldn't let go of her grief and her heart never recovered from the loss.

On August 7, 2025, we lost our beloved mother, Evelyn. The months following her diagnosis were extremely difficult. Watching a loved one endure such extreme mental, physical, and emotional changes is heartbreaking. My mother often spoke about Edsel in the present tense, saying he had come to visit her or would be visiting her soon. At times she would stare blankly at the wall and speak to him as if he were right there. On other days, she fully understood that he was gone, and she would cry for her son as though she had just lost him.

I will never forget the day before she passed. She looked up toward the sky, reached her arm out and said, "My

son," as if he were there reaching out for her. People tell us she is at peace now and that she is finally reunited with Edsel, and while that thought brings some small comfort, it doesn't lessen the pain of losing her and him.

The emptiness felt, left behind by their absences, is immense, and our lives have been forever changed. Sadly, our story is not unique. Mr. Clyde has taken another life before. Another family has already been shattered by his actions. 200, 400 months doesn't matter. No sentence, no matter how long, can bring back my brother or my mother. But how many more families must endure this kind of loss because of him?

THE COURT: Thank you.

MS. MAVEUS: And, Your Honor, Ms. Yazzie would like to read a letter that was written by Evelyn Badoni, the victim's mother, to Warden Rivers shortly after they were notified of the victim's death.

THE COURT: Okay. Thank you.

MS. YAZZIE: I'm not sure who Mr. Rivers is.

This is a letter from my sister: "I have been bothered by this letter. My son was maybe about to leave the place," which means prison. "My letter that I am writing is about questions why and how it happened. Is there security guards? Cameras? Why wasn't my son found until in the morning, whenever they found him? And when he was killed, while whatever happened to him at 2:30, around that time, they

don't know or to check on him? They are still humans. If there is a fight, why wasn't they're being watched? And I thought my son didn't have a roommate at the time. He always tells me that he has no roommate. How the hell did whatever my son gotten into -- whatever killed my son got in?

"I really thought prison was secured by the damn guards, warden, security. Were they taking a break while this all happened? I am very angry and frustrated by it. Yeah, I know my son was in prison. Like I said, he is a human. I am not -- I am very hurt that this happened under your eyes, and we tried to get information of what actually happened, and the damn place won't release any information. But yet it is all over the internet, media, and they are not parents or loved ones. This letter maybe doesn't mean anything to you just because we are Native American Indians and treat them like they're trash. Within a week, another inmate found dead again. Your prison needs to be investigated or something."

But this is from my sister. I just want to say that I'm her sister, my sister. And Edsel, me and Edsel talked a lot. We wrote each other. I retired from the U.S. Army, and he really respected me as a veteran.

THE COURT: Take your time.

MS. YAZZIE: No matter what, every year Veterans Day, he always made something for me, and he sends it to me, and that's what I miss of him. He was a respectful man and very

caring, and I'm just so -- that's all I'm saying. I just love my nephew. That's all in closing.

THE COURT: Thank you.

MS. MAVEUS: Thank you, Your Honor, for giving them the time to address the Court.

The impact of Edsel Badoni's murder clearly has collateral consequences. So based on our earlier argument and the consideration of all of those factors and the significant aggravation in this case, we are recommending that sentence at 450 months' imprisonment, consecutive to his current sentence.

Thank you.

THE COURT: All right. Give me a second, Mr. McLeese.

(Brief pause.)

THE COURT: All right. Whenever you are ready, Mr. McLeese.

MR. MCLEESE: Thank you, Judge.

There are some things and some significant things about this case that the parties agree on.

The first is that the facts of this crime are truly horrific, and I agree with the government that while murder is never anything less than an extremely serious offense, the most serious offense we know, it is the case that the facts here were horrific.

It is also agreed that the facts of Mr. Clyde's childhood and adolescence were horrific, which was the word

that was used by the prosecutor in her sentencing memo, and I then, frankly, quoted some of what she said about it.

We also agree that this case warrants a significant consecutive sentence. Where we disagree is what the duration of that sentence should be. Our position, Judge, is that rather than considering the government's position of an aggregate sentence of 660 months, which would be 55 years, our position -- and under that sentence, Mr. Clyde, if he lives so long, would be released when he was in his 70s. Our position, Judge, is that the Court should consider a consecutive sentence of 230 months, which would result in an aggregate sentence of 440 months, and would result in his release, as I calculated, in his 50s.

Where I think the government has gone astray in their argument is that the government never addresses, either in their sentencing memorandum nor here today, the question that the Court has to decide in imposing sentence. The question that has to be decided here, given the statutory factors of sentencing that the Court must consider, is whether a sentence in excess of the proposed disposition -- that is our proposal of 230 months consecutive, resulting in an aggregate sentence of 440 months -- would be necessary to satisfy the statutory purposes of punishment, namely retribution, deterrence, incapacitation, and rehabilitation. That's the fundamental question that the Court has to consider is whether a particular

sentence is necessary, not simply sufficient.

And it's unusual wording because although it's -- those of us who work in this field regularly can recite this language probably in our sleep, but it's --

THE COURT: I do every day.

MR. MCLEESE: Pardon me?

THE COURT: I do it every day.

MR. MCLEESE: I understand, Judge.

I think it is important to break it down as to how this standard actually functions because what this standard presumes or takes as a given is that there is a whole range of possible sentences that would be sufficient to satisfy the purposes of sentencing, and the "not greater than necessary" language then requires that an advocate, a court, whomever is arguing or making a decision, demonstrate that a lesser sentence than the one in this case I'm proposing would be insufficient.

Until you reach that point that something is insufficient, you haven't gotten to the point where the sentence is necessary. And it's a mischaracterization of our position, and I believe really the whole federal sentencing enterprise currently, to characterize our position as seeking a significant downward departure. We are not seeking a significant downward departure. Downward departures no longer have a place in federal sentencing and --

THE COURT: It's a downward variance, right?

MR. MCLEESE: Okay. Right. But there is a difference because it carries all that baggage, I mean a potential difference.

THE COURT: This book, the 2025, gets rid of departures. So we are good. We are good. I get it.

MR. MCLEESE: Okay. Well, I'm raising this because I believe that is why the government has gone astray in their argument because they never confront the question that must be decided.

The assault at the jail is, of course, significant, though I believe that the government significantly overstates it when, if I heard correctly, they said that but for the grace of God that would have ended in murder. This was something that took place in a crowded room at the jail, inmates all over, guards all over. This was interrupted almost immediately, and there was no way that it wouldn't have been.

What this shows, Your Honor, I submit, is that the mental health problems that were diagnosed not only in my client's childhood, but also by the Bureau of Prisons, which -- first off, he was deemed not competent to stand trial in his earlier case, and then he was, as the language goes, restored to competency, and he was then diagnosed by the Bureau of Prisons, and this would have been documented, as having intermittent explosive disorder, attention

deficit/hyperactivity disorder, and numerous other behavioral and mental health conditions.

And I agree that my client being in population can present dangers to other inmates, and that's not going to be a danger that the Bureau of Prisons is going to have to address for at least the next several years because he is, as the Court is probably aware, he is at Florence in Colorado where we understand that he will continue to be until at least 2031. And at Florence, Colorado, as the Court may be aware, it is basically permanent lockdown. Inmates have no contact with other inmates. Inmates do not get out of their cell except for twice a week for a couple of hours of "rec" in the yard. Everything is brought to them. There would not be any opportunity throughout that time for any kind of problem. And then it would be up to the Bureau of Prisons to determine what they thought was appropriate going forward with his incarceration. If they thought it was appropriate for him to be kept in that permanent lockdown situation, that would be their decision, but they have the tools to manage that.

I must say, though, that the circumstances of this case do raise questions about the Bureau of Prisons' management of the inmates entrusted to their care, among other things, because it's my understanding that this murder is one of at least three -- well, three murders involving cellmate murders. There are two others that involve murders of

cellmates. And, yes, I know there are some others, and one that was not sentenced that long ago by the Court.

But how the Bureau of Prisons could have thought that someone with my client's mental health record and someone with my client's various other behavioral issues, why it would be a good idea to have him confined 23 hours a day in a double-cell lockdown, it is very difficult to fathom. And as the Court is aware, that whole unit was shut down. And as I'm sure the Court is also aware, many people have weighed in to say that this kind of double-celling lockdown situation is not something that reduces crime, but it's "criminogenic" to use the fancy word, because if you have two people who are confined together for 23 hours a day, and if one of them has the mental health background and behavioral background of my client, sadly, this is, perhaps, an unsurprising result. But I want to make sure that I'm understood as I'm not saying that this is an excuse for the behavior. I'm not offering this as a matter of culpability for purposes of retribution.

What I am offering this point for is its relevance to the need for a period of confinement that goes into my client's 70s, if he makes it that far, because of threat to safety of others. What this case shows more than anything else is not that my client necessarily is someone who has to be imprisoned until he is in a wheelchair in order to protect society. What this case shows or the facts of this case show is that he is

not someone, and perhaps no inmate is someone, who should be put in these circumstances of double-celling lockdown 23 hours a day and so forth.

With regard to acceptance of responsibility and so forth, I decided not to challenge that because, as a guidelines matter, particularly given some of the case law about ongoing criminal activity, I decided to forgo that as a challenge. But it is, nonetheless, I think again, we are not in the guidelines world here. We are in 3553(a). And I think it is worth noting that my client has accepted responsibility, has expressed remorse for his behavior.

The probation officer notes at paragraph 75 of the original report that he said that if he had anything to change, he wouldn't have committed the offense, the other case or this one. Again, that is somebody -- that's the voice, I submit, of someone who recognizes that what he did was wrong. He is not a psychopath, but he is someone who has significant mental health/behavioral problems that contribute or at least have contributed here to horrific crimes.

Another thing that I think shows some attempt to express remorse or attempt to express his recognition of the seriousness of what he did -- and I realize that this offer that he was trying to make might seem at best perverse or at least odd, though I think it is consistent with the fact of my client's mental health problems and the fact that in several

ways he does seem unbalanced -- in a letter that he wrote to his sister that is appended to the presentence report, and I guess it was appended to the government's version of the offense, he wrote to his sister and asked her -- this is --

THE COURT: It is at the end. It is pages 235 and on. Actually, yes, 235. It is two letters. It is two documents. I have read them.

Go ahead.

MR. MCLEESE: He says, "Real quick, I need you to send me $200 so I can pay the victim's family for the casket." That might seem like a very strange overture. I am sorry to be raising this point even with family members in the court, but I think it does say something about my client's capacity for recognition that he has done something terribly, terribly wrong, and he is trying in his own way to think if there is something that he can do, and that's what he was wondering if he could do. You may think, "Well, that's a pretty strange thing," and it may be a pretty strange thing. But I think in terms of the particular point here, as to whether this is a man who needs to be locked up until he is in his 70s in order to protect society and incapacitate him, I think that this is relevant to that.

As Your Honor is, I'm sure, well aware, statistically, rates of recidivism plummet the older an offender gets. Granted, each offender is an individual, and statistics are

statistics, but that is, nonetheless, pertinent here to how it was that I decided to propose a sentence that would not have him being released until he was in his 50s.

Judge, the government says, "Well, Your Honor sees a lot of people with horrific childhoods," and I'm sure that's true. I have been doing this work for a long time, and I have seen a lot of horrific childhoods. I don't know that I have seen -- and this is not a competition -- I don't know that I have seen a childhood and adolescence that had so many different horrific elements to them, as well as, then, mental health problems that continued on to his adulthood and during his period of confinement, all of which, I submit, are highly relevant for purposes of retribution and are recognized in the case law as such, as relevant in terms -- because retribution, as the Court is aware, has two parts: the harm done and the culpability of the defendant. And as discussed in our sentencing memorandum, retribution is premised on the proposition that individuals have free choice, they exercise free choice, and therefore they should be treated as if what they were doing was a matter of free choice.

But that proposition, that premise breaks down some when you have somebody who by virtue of environmental factors and mental health factors does not have free choice in the way that most of us think of it.

THE COURT: Okay. I don't want to get into a whole

philosophical discussion, but if I accept your argument there -- sure, I take it as true, even though I necessarily don't do that -- as soon as you accept that argument, it bounces right over into likelihood to re-offend. That's the immediate response is, "Yeah, he has got mental health issues, it's terrible, so no retribution." But then I look at the other obvious factor, which is likelihood to re-offend, and if he has got mental health issues this significant, as you are saying, isn't he much more likely to re-offend? And then it just washes out.

MR. MCLEESE: I understand that point, Judge.

THE COURT: Okay. Just making sure we are all on the same page.

MR. MCLEESE: I think if he were to get adequate mental health care in the Bureau of Prisons, that might go some distance.

THE COURT: How do they give him adequate mental health care if he is running around stabbing people to death?

MR. MCLEESE: I'm assuming that was a rhetorical question, Judge.

THE COURT: Well, if you want to answer. You don't have to answer.

MR. MCLEESE: He was in the Bureau of Prisons for many years before he stabbed someone to death, after being put into an environment that many experienced prison and criminal

justice authorities deemed toxic. But I don't think that the two necessarily walk hand in hand, meaning I don't think that the fact that he has got these mental health problems and that that diminishes culpability for purposes of retribution necessarily turns over to say, "Okay. Well, then, we need to have him be locked up basically for the rest of his life because he would be a danger," because, among other things, Judge, as the Court is aware, it is quite common to have conditions of supervised release that include requirements of mental health care in the community, that include requirements of taking medication as directed, and so forth.

So I don't think that someone having mental health problems, even significant mental health problems, necessarily leads to a conclusion that someone in his 30s, I guess at this point, needs to be locked up until, at the earliest, he was in his 70s because I think that there are other ways of dealing with that.

And, again, Judge, at the risk of repeating myself, the question, again, is necessity, whether it is necessary that he be locked up for the rest of his life for committing a crime under circumstances that significantly increase the likelihood that someone with his own set of mental health and behavioral issues would have acted in a criminal fashion.

With that said, I certainly agree with the family members that one of the things that is saddest about these

hearings is that nothing that they say, nothing that you can do, nothing that any of us can do could undo the damage done. I don't think that a sentence for the rest of my client's life is something that would undo that damage either.

THE COURT: Okay.

MR. MCLEESE: Unless the Court has any questions, I will conclude with that.

THE COURT: All right. Thank you.

Ms. Maveus, anything else?

MS. MAVEUS: No. Thank you, Your Honor.

THE COURT: All right. Mr. Clyde, you have heard statements from the government as well as Mr. McLeese as to your sentencing. All defendants have the opportunity to make a statement regarding their sentencing. You have the right to make a statement. You also have the right not to make a statement, and if you don't make a statement, I will not consider your decision not to make a statement as a showing of a lack of remorse. I will remind you, however, that you are under oath.

Mr. Clyde, would you like to make a statement?

DEFENDANT CLYDE: Yes, sir.

THE COURT: Okay. You have to speak slowly and clearly into the microphone.

DEFENDANT CLYDE: Can you excuse me?

MR. MCLEESE: Pardon me?

DEFENDANT CLYDE: Can you excuse me?

MR. MCLEESE: Yes, I can move.

DEFENDANT CLYDE: Can I take these handcuffs off?

THE COURT: No.

Would you like to make a statement, Mr. Clyde?

DEFENDANT CLYDE: Yes, sir.

THE COURT: Okay. Go ahead.

DEFENDANT CLYDE: Diné Bikéyah. That means land of the people in Navajo. No Indian country for old men. The little Indian gets drunk, puts his war paint on, and runs around with a machete. The Navajo code talkers, salute soldier.

THE COURT: Anything else you would like to add?

DEFENDANT CLYDE: No, sir.

THE COURT: Okay. Thank you, sir.

You can have a seat.

While I have broad discretion in sentencing defendants, Congress requires that I impose a sentence sufficient but not greater than necessary to serve the purposes stated in 18 USC Section 3553(a), and in doing so, I must consider the following general sentencing factors:

So Mr. McLeese has part of this right. Here is the question: 3553(a) says: "The court shall" -- it is mandatory language -- "The court shall impose a sentence sufficient but not greater than necessary" -- that's his point -- "to comply

with the purposes set forth in paragraph 2 of the subsection," which goes through all the factors that I'm going to talk about now. They include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences that are available -- again, probation, obviously, not available, and for good reason -- any sentencing commission policy statements.

If you looked under 5H back when we had under the advisory guideline manual, it talked about all kinds of factors for departures, meaning variances, and then the 2025 manual removed them, but then told me I can still consider them, but there are ones that they said I couldn't consider. So it is kind of a merry-go-round of consider them if you want, don't consider them. They are not binding on me.

Obviously, the most relevant one is the "disadvantaged upbringing," which is terrible language. It does not capture what Mr. Clyde went through as a youth.

Mr. Clyde, no child should go through what you went through as a youth and be subjected to what you were subjected to.

Having said that, look, I just had Mr. Finley who was in here yesterday or the day before. He witnessed a brutal rape and murder of a little kid when he was 10 years old. He hasn't killed anybody. I, unfortunately, see a lot, a lot of people with terrible, terrible, terrible upbringings. So that

is, I'm told -- I was told I shouldn't consider it. I consider it. It gets put in as a factor.

I need to also make sure the sentence avoids unwarranted sentencing disparities. The Seventh Circuit reminds the district court that the best way to address that one particular factor, and it is just one of many, many factors, is to impose a sentence within the guideline range.

So as I mentioned during Mr. Finley's sentencing the other day, sometimes a wooden, rote, mechanical application of the advisory guideline range results in a sentence that is inconsistent with 3553(a). During Mr. Finley's, the mechanical application resulted in a sentence that was inconsistent with 3553(a) on the high side. So I varied downward.

Today, I believe a mechanical application of the guideline calculation is inconsistent with 3553(a), and I'm going to go over. Judge Gettleman usually starts his sentencing by saying that judges should come to sentencing from a place of sadness, not anger. I agree with him. And then I usually try to add in both sadness and hope, hope that there is something good that can come out of it, something positive can result. I'm not finding hope here. There is not much hope. The only hope is that Mr. Clyde will not kill again. That's my hope.

Other factors I need to consider is that the sentence reflects the seriousness of the offense. Look, it is not just

the offense, which is murder, it is the nature and circumstances of the offense, and we will talk about that.

I need to ensure that it promotes respect for the law and provides just punishment for the offense. Obviously, just punishment is the ultimate touchstone in all of this. I don't know why it is buried in the middle of the statute.

The need to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant, that is a critical, critical point here.

I need to also provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

I will recommend that Mr. Clyde receive as much mental health treatment and care as possible in the Bureau of Prisons because I think he needs it.

I'm going to back up to the protection from further crimes of the defendant. The prior victim, Enrique Kayannie, K-a-y-a-n-n-i-e, his mom said -- it is page 9, paragraph 33, I want to say -- she felt the defendant should receive a life sentence so he does not hurt another innocent child or cause another innocent family to hurt forever. She wanted the defendant to serve the maximum sentence permitted by law because she felt he has no regard for human life and will kill again.

And then Ms. Yazzie reads the letter from her sister,

the mother of Edsel Badoni. Basically, the same thing. Two moms begging that Mr. Clyde not be put in a situation where he can kill again. I hate to say that Ms. Kayannie -- oh, it is his mom. Actually, her name, let's get it right. She is entitled to that respect. Patricia Tohommie, T-o-h-o-m-m-i-e, was prophetic, unfortunately, and I don't want Edsel's mom's letter she wrote before she perished, before she died, to be just as prophetic.

So let's back this up to the elements under 3553(a) and make sure we answer the question that I impose a sentence that is sufficient but not greater than necessary to comply with the purposes in this statute.

The nature and the circumstances of the offense -- the offense, that's the offense that Mr. Clyde pled guilty to -- it's murder. It's the ultimate crime. Again, it is not just the crime itself, it is the nature and circumstances of the offense. We have 100 wounds, if not more -- I don't know if they just stopped counting at 100 -- 100 wounds, the stab wounds, with the shanks. No basis provided, whether it was provoked, self-defense, whatever. I can't imagine what would have to happen. But, I mean, just think about how long it takes to -- and I apologize -- to inflict 100 stab wounds on a person. I mean, if you are stabbing somebody one a second, that's two minutes of being stabbed, knowing the whole time you are likely going to die. Sometimes the English language fails

and runs out of words, proper words, whether they are adjectives or adverbs. These are some that come to mind: brutal, savage, barbaric, heinous. I think the government used "gratuitous."

It is important to remember that Mr. Clyde is a human, and he needs to be treated with humanity and respect, even when he does not treat others with humanity or respect or other creatures on this planet with any sense of humanity.

So the nature and circumstances of the offense, it's just beyond category. And if this goes up on appeal, and any judge, the law clerks want to take a look at what I'm talking about, well, it is right there in the PSR, and they can look at the photographs of Mr. Badoni. I'm never going to be able to forget these photographs, never in my entire life, never. So those words probably fail, and these pictures tell a lot. They tell a lot.

The history and characteristics of the defendant: The history of discipline in the Bureau of Prisons as well as the jail, we can go -- and there is lots of it, and it's a history, repeated history, of violence, danger, fighting across the board, just nonstop. You can go back to Mr. Clyde's time in school when he stabbed a teacher with a pencil. This is not new behavior. It started at a young age, and it continued just recently over at the Winnebago County Jail, stabbing people. Humans, stabbing them, one to death over 100 times. That goes

to the history and characteristics of the defendant. The killing of animals in the most vile and inhumane ways, that is described throughout, at least two places in the presentence investigation report, killing a dog with his bare hands.

The stabbing a teacher is at page 17, paragraph 64, if anybody needs that.

Paragraph 99, page 22: "The defendant 'readily discussed' his history of fighting with others in the community as well as his cruelty to animals (e.g. history of blowing up birds with firecrackers and choking multiple dogs to death). According to the evaluation, 'he oddly smirked when discussing his history of harm to animals and others.' During his evaluation period, he was involved in verbal and physical altercations with other inmates, including striking a handcuffed inmate." Well, there is somebody who is defenseless that he is assaulting. "He asked about engaging in such behavior. The defendant stated, 'I don't know why I do it, homes. I just don't want to be disrespected.'" That will tell you a lot about the history and characteristics of the defendant.

And we can talk -- again, this is not the first murder. It's the second murder. Enrique perished at the hands of Mr. Clyde, just as horrific. Mr. Clyde beat him to death with a baseball bat, literally smashing Mr. Kehannie's brains out of his head, teeth knocked out of his head. His mom had to

go there and pick up brain matter and teeth so he could be buried as best he could, and this is an important part because it blows a complete hole into this "Thomson made me do it." I know it is not being offered as an excuse, but it certainly sounds like it.

That nearly identical crime happened while he was out in the free world. He did that not within the Bureau of Prisons, not within the horrific confines of Thomson prison. He did that out in society. So this is not a Thomson issue in large part. It's a Mr. Clyde issue. And then it is not Thomson, again, because when he is in gen pop over at the Winnebago County Jail, in the day room, he stabs somebody else for apparently no reason.

This doesn't get blamed on Thomson. Thomson doesn't wear the jacket on this in large part. Thomson was horrific. I have put it on the record multiple cases, multiple times. I'm fully aware of what happened at USP Thomson. I put on the record what I did when I became aware of public information about USP Thomson. That's in the record. I don't need to say it again. I know what happened at Thomson and the horrific nature of Thomson. This isn't Thomson. This is Mr. Clyde, and that's the focus, is the focus is on the defendant and the appropriate sentence for Mr. Clyde under these circumstances.

You look at the history and characteristics. He is uncontrollable -- and that's on page 20, paragraph 87 -- as a

young man. He busted windows, started fires, spray-painted cars and houses. And then it continues on throughout his entire career in various institutions where he is incarcerated. Just completely uncontrollable.

I have addressed Mr. McLeese's point about the disadvantaged upbringing. I consider it. But I also consider it as a source of dangerousness and the need to protect the public, including other inmates in the Bureau of Prisons.

There is also the issue of remorse. There is the line in the letter that's attached to the PSR, but I will also remind you that in that very same letter, the murders that he committed, he doesn't refer to them as murders. He refers to them as demonstrations. That's not remorse. That is a complete mental excuse, a reimagination of his own particular actions. That's not remorse.

Yeah, there is the mention about the casket, but a couple -- but calling his murders "demonstrations" and the sort of blithefulness -- you can read the letter. Again, if it goes up on appeal, they can read the letter. It is cavalier and blitheful, and, "Yeah, here's what's going on. Yeah, I have got a murder coming up. Yeah, I killed somebody before." It's so cavalier.

There needs to be an understanding of inmates both in the Bureau of Prisons as well as over at the Winnebago County Jail that there are consequences for their actions, and they

will be held accountable, especially these types of actions. That needs to be considered.

There is the correct question, again, under 3553(a), which, of course, 3553 incorporates the advisory guideline manual, which I have to consider, and so I know what the guideline range is. I know what Mr. McLeese is asking for, 230 months. Again, maybe recidivism decreases as people get old. I just had a 48-year-old in front of me. I have supervised release violations day in, day out in this court with people north of 50, people who have been released on commutation or on presidential sentences being commuted, and six months later they are back at it. I know what the statistics say, but I know what the reality is as well.

So statistics are what they are. I need to sentence the defendant, the individual in front of me, based upon the factors. So, sure, there might be some statistics that recidivism rates go down as people age out. I will consider that. But, more importantly, I consider the statute and the facts and circumstances of the specific case before me.

I have considered all the documents I have identified. I have considered the victim impact statements. I have considered Mr. Clyde's allocution, the arguments of the government, the arguments of Mr. McLeese. I have considered the advisory guideline range and its policy statements and all the factors identified in 18 USC Section 3553(a). And the

answer to the question is life is necessary. Life is absolutely necessary. It is what is sufficient but not greater than necessary to serve these factors based upon the particular facts and circumstances of this case and Mr. Clyde. That's the answer to the question.

So having considered all those, including the totality of the circumstances in this case to fashion a sentence, I am imposing a sentence of life imprisonment. It is going to be consecutive to the underlying conviction out of the District of Arizona in 16 CR 8145. There will be no fine. I don't have any information on restitution, so no restitution as far as I know. There will be a special assessment of $100. There will be no term of supervised release for two reasons: one, I have imposed life, and, second, he already has a term of supervised release in the District of Arizona case, 16 CR 8145. So no term of supervised release.

Mr. Clyde, you have the right to appeal. You have given up certain rights, but you have the right to appeal, and if you want to file an appeal, you must file a notice of appeal within 14 days after judgment is entered in your case. If you are unable to pay the cost of an appeal, you may apply for leave to appeal in forma pauperis. If you so request and qualify, the clerk of the court will arrange for legal representation and will prepare and file the notice of appeal on your behalf. If you cannot afford an attorney on appeal,

you can ask for one to represent you free of charge.

I believe Mr. Clyde is at Florence. I leave it to the Bureau of Prisons to determine the safest location for his incarceration.

Before we get to the motion to dismiss Counts 2 and 3, Ms. Maveus, any procedural errors I can correct while we are here today?

MS. MAVEUS: No, Your Honor.

THE COURT: Mr. McLeese, I know you adamantly disagree with the substance of my ruling, and if you want, you can take it up with the Seventh Circuit. That is absolutely appropriate under the plea agreement. But are there any procedural errors that I can correct while we are here today?

MR. MCLEESE: No, Judge.

THE COURT: All right. Have I addressed all your main arguments?

MR. MCLEESE: Yes, Judge.

THE COURT: Okay. All right. So is there a motion by the government?

MS. MAVEUS: Yes, Your Honor. The government would move to dismiss Counts 2 and 3, the remaining counts of the indictment.

THE COURT: Mr. McLeese, I assume there is no objection?

MR. MCLEESE: No objection, Judge.

THE COURT: The Court grants the motion finding that the defendant's plea of guilty to Count 1 adequately reflects the seriousness of defendant's crime.

(Proceedings concluded at 3:01 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Heather Perkins-Reiva* *February 19, 2026*

Heather Perkins-Reiva
Official Court Reporter

Date

# UNITED STATES DISTRICT COURT

Northern District of Illinois

UNITED STATES OF AMERICA
v.

**HOUSTON A. CLYDE**

**JUDGMENT IN A CRIMINAL CASE**

Case Number: **3:22-CR-50034(1)**

USM Number: **60506-408**

**Richard H. McLeese**
Defendant's Attorney

**THE DEFENDANT:**

☒ pleaded guilty to count(s) 1 of the Indictment.
☐ pleaded nolo contendere to count(s) which was accepted by the court.
☐ was found guilty on count(s) after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 18 U.S.C. § 1111(a)(b) Second Degree Murder Within United States Territorial Jurisdiction (Bureau of Prisons Facility) | 11/27/2020 | 1 |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count(s) 2 and 3 are dismissed on the motion of the United States

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

**December 17, 2025**
Date of Imposition of Judgment

Signature of Judge
Iain D. Johnston, United States District Judge

**December 18, 2025**
Date

DEFENDANT: HOUSTON A. CLYDE
CASE NUMBER: 3:22-CR-50034(1)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
**Life as to count 1 to run consecutive with United States District Court for District of Arizona Docket No. 16CR8145.**

☒ The court makes the following recommendations to the Bureau of Prisons: USP Florence. The court also recommends the defendant get mental health treatment and care.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

- ☐ at on
- ☐ as notified by the United States Marshal.
- ☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
  - ☐ before 2:00 pm on
  - ☐ as notified by the United States Marshal.
  - ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:
________________________________________
________________________________________
________________________________________

Defendant delivered on __________ to ____________________ at________________________, with a certified copy of this judgment.

________________________
UNITED STATES MARSHAL

By ________________________
DEPUTY UNITED STATES MARSHALS

DEFENDANT: HOUSTON A. CLYDE
CASE NUMBER: 3:22-CR-50034(1)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $100.00 | $.00 | $.00 | $.00 | $.00 |

☐ The determination of restitution is deferred until . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**. All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the .

☐ the interest requirement for the is modified as follows:

☐ The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: HOUSTON A. CLYDE
CASE NUMBER: 3:22-CR-50034(1)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒ Lump sum payment of $100 due immediately.

☐ balance due not later than , or

☐ balance due in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal *(e.g. weekly, monthly, quarterly)* installments of $ over a period of *(e.g., months or years)*, to commence *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal *(e.g. weekly, monthly, quarterly)* installments of $ over a period of *(e.g., months or years)*, to commence *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.